3:19 mj 189

FILED
RICHARD W. NAGEL
CLERK OF COURT
2019 APR -8 PM 2:20
U.S. DISTRICT COURT
SOUTHERN DISTRICT OH
WESTERN DIV DAYTON

## AFFIDAVIT

### INTRODUCTION AND AGENT BACKGROUND

I, Frederick J. Seitz IV, after being first duly sworn upon oath, depose and state:

I am a Special Agent, United States Air Force Office of Special Investigations (AFOSI) 10th Field Investigations Squadron (FIS), Wright-Patterson AFB (WPAFB), OH, after being duly sworn, declare as follows: I am a Special Agent currently assigned to AFOSI 10 FIS. I have been an accredited Federal Agent for AFOSI since Jan of 2017. I received training to be a Federal Agent at the Criminal Investigator Training Program at the Federal Law Enforcement Training Center (FLETC), Glynco, GA, with further training at the United States Air Force Special Investigations Academy also at Glynco, GA. During the 20-week course, I studied topics such as criminal law, the 4th Amendment, search and seizure, surveillance, interrogations, arrest techniques and defensive tactics. Additionally, I completed training at the Crime Scene Investigator Training Program at FLETC, Glynco, GA, in Aug 2018 and Digital Evidence Acquisitions Specialist Training Program at FLETC, Glynco, GA, in Mar 2019. Prior to becoming a Federal Agent, I was a Security Forces Investigator for the 355th Security Forces Squadron (SFS), Davis-Monthan AFB, AZ and the 90th SFS, F.E. Warren AFB, WY, for five years.

Along with other agents and investigators, I am conducting an investigation into the violation of the following federal offenses described in Attachment C, which are believed to have been committed by JAMES R. GORD (herein after GORD); Male Born: 29 Apr 64; Ohio; DR4; SSN: 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; Air Force Research Laboratory, Hypersonics Directorate, Wright-Patterson AFB, OH.

I have reason to believe particular digital devices and related storage devices may contain evidence identifying paper records, receipts, electronic records, and possible witness(es) to the crimes outlined below, and further described in Attachment C.

Based on my training and experience and the facts set forth in this Affidavit, there is probable cause to believe violations of the following federal statutes may have been committed by GORD: 18 USC 1384, Prostitution Near Military and Naval Establishments, 18 USC 287, False, Fictitious or Fraudulent Claims, 18 USC 641, Embezzlement/Misuse of Government Property, 18 USC 1001, False Statements, 18 USC 872, Extortion of Officers or Employees of the United States, 18 USC Sec 7 & 13 which assimilate ORC 2927.12, Ethnic Intimidation and ORC 2903.21, Aggravated Menacing.

This Affidavit does not contain every fact known to the investigation, but only those deemed necessary to demonstrate sufficient probable cause to support the issuance of the requested search warrant.

As part of the investigation, I have reviewed documentation; electronic records and reports provided by and discussed information with other agents and investigators involved in the investigation. For purposes of this Affidavit, I have not distinguished between information of which I have direct knowledge and that of which I have hearsay knowledge.

### JURISDICTION

This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. Specifically, this Court is a district court (including a magistrate judge) of the United States which has jurisdiction over the offense being investigated. 18 U.S.C. § 2711(3)(A)(i).

---

AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS  Page 1 of 11

**STATEMENT OF PROBABLE CAUSE**

BACKGROUND OF INVESTIGATION

This investigation was initiated on 21 March 19 based upon information provided by Civ (Dr) SUKESH ROY (herein after ROY), Defense Contractor, Spectral Energies, Dayton, OH that GORD engaging in unethical government contract negotiations, communicated threats of violence, and was regularly soliciting prostitution.

On 15 March 19, SA MATTHEW BLOCKER and SA ROBERT KRING, AFOSI 10 FIS, WPAFB, OH interviewed ROY at AFOSI 10 FIS. ROY provided a signed, sworn statement and verbally relayed the following information: ROY was the owner and operator of a private company called, Spectral Energies, which provided unclassified contract laser imagining of turbine engines to the U.S. Government. GORD was a senior research scientist at Air Force Research Laboratory (AFRL)/RQ where ROY knew GORD for approximately 17 years. The two men had a professional relationship through their common scientific interests and research on behalf of AFRL as a program manager. Through this relationship, ROY and GORD grew close and became friends. In 2017, GORD lost his father to suicide and experienced severe depression as a result.

In October 17, ROY shared with GORD he was looking to hire an administrative technician at Spectral Energies. GORD explained he recently met a young professional while on a flight to Washington, DC. GORD went on to say he sat next to Civ AMANDA SAVINO, Defense Contractor, (Currently of) Innovative Scientific Solutions Incorporated (ISSI), Dayton, OH on the plane and was very impressed with how she presented herself. GORD believed SAVINO would be a good fit for ROY's company and provided ROY a copy of SAVINO's resume (Exhibit 2). GORD highly encouraged him to hire her, speaking favorably of SAVINO's technical expertise. He then finished by stating, "she's also really hot." At that time, ROY did not think anything of this comment and agreed to interview SAVINO for the position. After reviewing the resume and interviewing SAVINO, ROY hired her into the administrative technician position at Spectral Energies, effective November 17.

Over the next few months, ROY grew frustrated with SAVINO's lack of capability in the position. She was not timely with her suspenses, did not fully understand how to use basic word processing and document creation software, and struggled to formulate coherent interoffice emails. Additionally, ROY rarely saw SAVINO at her desk, located in Building 5, Area B, WPAFB, OH even though her timecard indicated she spent eight hours at work on any given day. When ROY confronted SAVINO about this she replied she had been teleworking. ROY explained to her the company telework policy and how she was not properly documenting her time away. Independent of this, several of ROY's employees expressed concern about the amount of time GORD and SAVINO were spending together in the office during each day. Their interactions were often behind closed doors and made the staff extremely uncomfortable as there was a perception that GORD and SAVINO were having an intimate relationship.

At the end of December 17, GORD asked to speak with ROY about SAVINO. As such, ROY decided he would share with GORD his issues with SAVINO's poor work performance and the perception the staff had of GORD's relationship with her. During this conversation, GORD disclosed to ROY that SAVINO was a prostitute he met in Cincinnati, OH. GORD went on to explain he kept a spreadsheet on his government issued laptop of prostitutes in various cities around the U.S. When he

traveled on behalf of the U.S. Government, he met with these women for various sexual exchanges. GORD, who was married to Civ RENEE GORD, 3877 Fernwall Drive, Beavercreek, OH, did not want his wife or children to know about his relationships with these women. As such, he would take out cash advances against his government travel card (GTC) to pay these women so that the family finances were not visibly affected.

GORD relayed he met with SAVINO on several occasions and paid her $400 dollars an hour for various sexual acts. Through this regular engagement, GORD eventually fell in love with SAVINO. He expressed his true feelings for her and SAVINO responded she felt the same for him. The two communicated via GORD's government issued iPhone where he routinely received sexually explicit text messages and images from SAVINO. GORD went on to explain that when they began their relationship, he was aware SAVINO had several other male clients. She once shared with GORD that one of these clients was an employee at the National Air and Space Intelligence Center (NASIC), WPAFB, OH. He paid SAVINO approximately $20K per year to clean his residence in the nude and then perform oral sex on him.

GORD asked SAVINO to make him her exclusive client. She agreed to stop seeing other men if GORD would get her a position with WPAFB which was why GORD gave ROY her resume and recommended her for a position. However in December 17, GORD followed SAVINO without her knowledge and learned she was still meeting with male clients, despite their arrangement. GORD was distressed by this as he was in love with SAVINO.

GORD also shared he brought SAVINO with him when he attended a research collaboration meeting at Purdue University with Civ (Dr) TERRENCE MEYER, Professor of Mechanical Engineering, School of Engineering, Purdue, University, IN. While SAVINO did not attend the meeting, she stayed with GORD in West Lafayette, IN and invited her "friend" to come and visit while GORD was working. GORD did not know anything about the friend other than he was an Irish-national residing in Vancouver, Canada. Upon returning to the hotel room, GORD heard SAVINO and this male companion engaged in a verbal altercation. GORD had to mediate the conversation to calm both parties down. After some reflection, GORD believed this man might have been another romantic partner of SAVINO's.

GORD again expressed concern to ROY that he was losing SAVINO's interest and asked for ROY's help to improve his romantic relationship. GORD suggested ROY involve SAVINO more with Spectral Energies technical research and asked for her name be included in future "white paper" publications (Agent Note: A "white paper" is an unclassified publication released on open source channels which outlined research efforts or discoveries). GORD then asked ROY to ensure SAVINO was the Spectral Energies representative on any AFRL/RQ temporary duties (TDY) out of the greater Dayton, OH area. ROY refused both requests citing SAVINO's position with the company as an administrative technician and her not being a technical expert in their field. ROY further outlined his ethical concerns surrounding GORD's romantic relationship with SAVINO and asked him to cease all contact with her. This angered GORD but ultimately ended the discussion about SAVINO traveling TDY or being published as a coauthor. Shortly thereafter, ROY issued a company-wide policy that no member of the team was allowed to be behind a closed door alone with SAVINO.

After learning about the true nature of GORD's relationship with SAVINO and based on her poor work performance, ROY met with his attorney to discuss her termination from the company. ROY was advised to wait until SAVINO's one year review in November 18 to release her from Spectral Energies as this limited the company's potential liability. ROY agreed and shortly thereafter shared his decision to terminate SAVINO's employment with GORD. GORD was frustrated with ROY's decision and urged him to reconsider. ROY declined explaining beyond being uncomfortable with employing GORD's mistress, SAVINO was not performing in her duties. In Apr 18, GORD notified ROY that SAVINO filed

135  a sexual harassment suit against ROY for instituting the "no closed door policy" and restricting her TDY
136  travel with GORD. ROY confronted SAVINO about this suit and she told him she felt discriminated
137  against for being a female and felt that ROY was not a good boss. In May 18, GORD was scheduled to
138  attend a collaboration meeting in Washington, DC with the Defense Threat Reduction Agency (DTRA)
139  but he failed to attend. When ROY learned of this he confronted GORD who explained he was too
140  distressed to attend the meeting because SAVINO was withholding sex from him. Additionally his wife,
141  R. GORD, asked GORD directly if he was having an affair with SAVINO. GORD lied to R. GORD and
142  said they were just friends and that the platonic relationship with SAVINO helped him cope with his
143  mental health issues. GORD went on to say ROY was the only person with whom GORD confided all
144  these details of his personal life. If anyone ever learned about the true nature of his relationship with
145  SAVINO, GORD would know ROY was the one who leaked this information. GORD's response to this
146  would be to come to Building 5 with one of his many guns to, "end it all." ROY perceived this to mean
147  GORD would kill ROY and then himself. In response, he carefully and respectfully asked GORD to limit
148  all future personal communication regarding SAVINO with ROY. GORD agreed and reminded ROY to
149  keep quiet about everything. He then reminded ROY he was a senior research scientist at AFRL, and that
150  as ROY was a Bangladeshi immigrant and the, "old boys club" at AFRL would not believe a word of this
151  about someone as well respected as GORD.

152        In Oct 18, approximately two weeks before her one year review, SAVINO told ROY she was
153  resigning from Spectral Energies. ROY was confident GORD told SAVINO she would be let go but did
154  not press the issue as SAVINO was leaving the company. Shortly thereafter, ROY learned SAVINO was
155  hired as an administrative technician at ROY's competitor company, ISSI, that she was being cited as a
156  technical research assistant on a pending ISSI publication, and was traveling with GORD to various
157  scientific conferences.

158        It was around this same time Spectral Energies was due to receive a $250K research grant from
159  AFRL. But upon delivery of the funds, Spectral Energies only received $100K. ROY inquired with the
160  WPAFB Contracting Office and was informed GORD split the contract between Spectral Energies and
161  ISSI with the remaining $150K going to ISSI. ROY was confident GORD made this decision because
162  ISSI agreed to hire SAVINO. It was around this same time ROY heard through Civ MEL ROCKMORE,
163  that GORD recently told him if ROY did not start, "playing nice" and including SAVINO on their
164  research, AFRL/RQ would be transferring their research contracts to ISSI.

165        Over the next few months, several colleagues shared with ROY that GORD was introducing
166  SAVINO around professional circles as a research assistant. He even had SAVINO chairing a scientific
167  panel at an upcoming Research and Applications of Photonics in Defense (RAPID) conference as a
168  technical expert. During this time, a colleague informed ROY that the owner of ISSI, Civ (Dr) JOHN
169  HOKE, ISSI, Dayton, OH was surprised ROY allowed SAVINO to leave Spectral Energies considering
170  how important she was to GORD. ROY learned GORD was overheard telling several senior AFRL
171  leaders they should consider avoiding future research opportunities with Spectral Energies and focus their
172  contract work towards ISSI. ROY was also aware GORD recently applied for a promotion to a position
173  at the Arnold Engineering Development Center (AEDC), Arnold AFB, TN and believed if GORD were
174  selected he would ensure SAVINO was hired into a civil service position and received a security
175  clearance.

176        In late 2018, several Spectral Energies employees came to ROY with their concerns. By March
177  19, four of his 32 employees gave ROY six memorandums for record (MFR) outlining various issues
178  regarding GORD's unprofessional conduct. These letters detailed GORD physically threatening people,
179  presenting SAVINO as a "research scientist," making racially disparaging remarks towards an ethnic
180  Chinese employee, and shouting in anger in the workplace. GORD became known for his violent verbal
181  outbursts around the office and was routinely heard suggesting he should bring a gun into Building 5 and

start shooting. ROY fielded these concerns from his employees but out of fear for his safety and the safety of his family, ROY did not elevate any issues with GORD to anyone at AFRL. In March 19, several employees told ROY they no longer felt safe coming to work or being around GORD. GORD's outbursts and comments about bringing a gun to work had ROY's employees fearful for their lives. On multiple occasions in their relationship, GORD told ROY he was an avid gun owner and had a concealed carry weapons permit (CCW).

From 18-19 March 19, SA KRING coordinated with Civ DENNIS REED, Security Manager, AFRL/RQ, WPAFB, OH to collect information on the U.S. Government equipment signed out to GORD. According to a spreadsheet collected by REED, GORD was assigned a laptop, a Defense Research and Engineering Network (DREN) desktop computer, an iPhone, three external hard drives, and 19 standalone laboratory computers. Additionally, REED provided SA KRING with GORD's Air Force Form 4433 – U.S. Air Force Unclassified Wireless Mobile Device User Agreement, DD Form 2875 - System Authorization Access Request, and screen capture of the consent banner for the DREN system.

On 21 March 19, at approximately 1320 hours, SA KRING, SA MORENO, SA BRINTZENHOFF, SA CODY FACEMIRE, and SA GREGORY TECHTMAN, AFOSI 10 FIS, WPAFB, OH, searched GORD's office for the additional U.S. Government equipment. During the search, AFOSI 10 FIS agents seized GORD's laptop, DREN desktop computer, and two external hard drives located on top of GORD's desk. All items were located in plain view, within the office.

Prior to departing the office, GORD requested to retrieve his personal items from his desk. AFOSI 10 FIS agents complied with GORD's request, but prior to letting him enter his office, AFOSI 10 FIS agents did a safety sweep to ensure GORD did not have access to any weapons. During the safety sweep, AFOSI 10 FIS agents were unable to enter one locked door in GORD's filing cabinet. AFOSI 10 FIS agents stood in front of the filing cabinet while GORD retrieved his personal items. GORD was placed on administrative leave and GORD's common access card was seized by AFRL/RQ security. GORD was subsequently escorted off of WPAFB by AFOSI 10 FIS and 88th Security Forces Squadron (SFS) personnel.

On 29 March 19, SA SEITZ conducted a preview on a forensic image of GORD's issued work laptop. The preview identified several documents on GORD's laptop related to this investigation. A word document on GORD's laptop hard drive titled "Amanda". "Amanda" appeared to be a word document GORD typed to SAVINO in black after a disagreement. SAVINO appears to respond throughout the document in red. The document contains multiple references to SAVINO's past as a "call girl." The properties of this document show it was created by GORD on 12 Oct 2018 at 1951 hours and last saved by GORD on 12 Oct 2018 at 2249 hours. A word document on GORD's laptop hard drive titled "Amanda Savino Resume April 2018". The document showed a resume for SAVINO and the properties of the document showed it was authored by JEFFERY GORD, created on 17 Oct 2017 at 1433 hours and last saved 19 Apr 2018 at 1652 hours. Numerous excel spreadsheets were located on the laptop showing GORD kept meticulous records of trips, funds and account information regularly. In addition to his record keeping, several documents were identified as counseling for "AFS". "AFS" being SAVINO's initials seem to be GORD and SAVINO communicating with each other in each document. This being a method of communicating without electronically sending a document to another location. GORD was using his government owned laptop to make these communications.

On 1 April 19, SA BLOCKER contacted the University of Tennessee, Knoxville, the University of South Florida, and the Ohio Department of Public Safety to verify SAVINO's attendance and graduation from each of these academic institutes. None of the aforementioned organizations had any record of SAVINO as a student or graduate.

## INFORMATION ON DIGITAL STORAGE DEVICES

I know from my training and experience that virtually every person, home, business, and vehicle are extremely likely to use, possess and/or contain digital media devices and related digital storage devices. I also know that these devices can be used to delete, create, share, and store files and other data including documents, photographs, videos, electronic mail, search history and other relevant live and deleted user information.

I also know that such devices can be used to communicate and share information with others and that data can be transferred between various devices. I know such information may show evidence of current, on-going, future, and past criminal activity. Such information can be used to identify electronic records, witnesses, co-conspirators and attempts to hide criminal activity. It can also be used to establish a timeline of criminal activity including preplanning, execution, and post event information.

I also know that data from these devices can often include user attribution data that can identify the person(s) who sent, received, created, viewed, modified, or otherwise had control over particular content.

I also know that some portable and vehicle mounted devices capture and retain geo-location data such as GPS and may capture and store data from mobile devices that are connected wirelessly or by cables. I know that this information can be used to associate a particular user and include or exclude them from a particular geographic location on a particular date and time.

I also know that if these items are not seized and isolated from network connectivity in a timely manner, evidence may be destroyed, transferred, encrypted, modified, or otherwise lost forever.

For these reasons, I believe probable cause exists to seize and examine all digital storage devices and related accessories at the location described.

## REMOVAL OF DATA STORAGE DEVICES

I know that a forensic image or forensic extraction is an exact physical copy of the user data found on the storage media. A forensic image or forensic extraction captures data on the GORD media without viewing or changing the user data in any way. Absent unusual circumstances, it is essential that a forensic image or forensic extraction be obtained prior to conducting any search of data for information GORD to seizure pursuant to the warrant. I also know that during the search of the premises it is not always possible to create a forensic image of or search digital devices or media for data for a number of reasons, including the following:

1. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. Because there are so many different types of digital devices and software in use today, it is difficult to anticipate all of the necessary technical manuals, specialized equipment, and specific expertise necessary to conduct a thorough search of the media to ensure that the data will be preserved and evaluated in a useful manner.
2. Searching digital devices can require the use of precise, validated procedures designed to maintain the integrity of the evidence and to recover latent data not readily apparent to the casual user. The recovery of such data may require the use of special software and procedures, such as those used in a law enforcement laboratory.
3. The volume of data stored on many digital devices is typically so large that it will be highly impractical to search for data during the execution of the physical search of the premises. Storage devices capable of storing several terabytes of data are now commonplace in desktop computers. It can take several hours, or even days, to image a single drive. The larger the drive, the longer it takes. Depending on the number and size of the devices, the length of time that agents must remain on site to image and examine digital devices can become impractical.

## INVENTORY AND RETURN

AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS                              Page 6 of 11

274 A list of all items seized under the authority of this search warrant will be left at the searched
275 location along with the service copy of the search warrant. A copy of the list will also be provided to the
276 Court.
277 With respect to the seizure of electronic storage media or the seizure or imaging of electronically
278 stored information, we respectfully request the search warrant authorize a forensic search and seizure of
279 such digital material.

280 ## CONCLUSION

281 Based upon the aforementioned information, I respectfully submit there is probable cause to
282 believe evidence, fruits, and instrumentalities of the criminal offenses listed in Attachment C may be
283 located in the office location described in Attachment A. I, therefore, respectfully request the attached
284 warrants be issued authorizing the search and seizure of the items listed in Attachment B.
285

Respectfully submitted,

SPECIAL AGENT FREDERICK J. SEITZ IV
AIR FORCE OFFICE OF SPECIAL
INVESTIGATIONS

Subscribed and sworn to before me this _____ day of April, 2019.

Hon. M. [signature] US MJ

## ATTACHMENT A

### PLACE TO BE SEARCHED

Based upon the above-mentioned information, I believe there to be sufficient probable cause to search GORD's government office/assigned cubicle located at Building 5, Area B, Room 5P17, WPAFB, OH.

Based on the above-mentioned information, I also believe there to be sufficient probably cause to search all locked/unlocked containers such as desks, drawers, hutches and government furniture in GORD's government office.

Based upon the above-mentioned information, I believe there to be sufficient probable cause to search all electronic media, including, but not limited to, the third electronic hard drive, used by GORD in performance of his official duties. Based on the above information, I believe there to be sufficient probable cause to seize the items listed in Attachment B and perform tasks necessary to be able to extract, forensically image and conduct a search of those items and images.

## ATTACHMENT B

### PARTICULAR THINGS TO BE SEIZED

Items of evidence to be Seized and Searched within GORD's government office/assigned cubicle located at Building 5, Area B, Room 5P17, WPAFB, OH, include:

a. Non-digital (hard) documents including but not limited to files, paper records, and/or accountings;
b. All tower computers, laptop computers, tablet computers, and any related digital storage media;
c. All removable storage media, including hard disc drives, solid state drives (including the third hard drive assigned to GORD, live random access memory (RAM), wireless storage devices, USB flash storage devices, media cards (e.g. Compact Flash cards, Secure Digital cards, Micro Secure Digital cards), optical discs (e.g. CD's, DVD's, and Blue-ray discs), and any other device capable of storing digital data;
d. All mobile devices, tablets, pocket computers, cellular telephones and any other portable mobile device, Subscriber Identity Modules (SIM cards), removable media cards, and related digital storage media;
e. All navigation devices, such as portable GPS (Global Positioning System) navigation devices, vehicle navigation systems, Infotainment systems, and other devices that may contain geo-location data and user information;
f. All digital cameras, digital audio recording devices, digital video cameras, digital video recording systems (DVR), smart speakers, removable media cards, hard drive discs, and related digital storage media;
g. Any associated power cords, power supplies, cables, adapters, dongles, keys, software, manuals, routers, modems, wireless connections and connected device network information (e.g. Service Set Identifiers, Media Access Control addresses, TCP/IP), or any other items or information that may be necessary for access, allow proper operation, examination and analysis of the items seized; and
h. All evidence of user attribution including accounts, e-mail accounts, passwords, PIN codes, patterns, account names, user names, screen names, remote data storage, or any other evidence that may demonstrate attribution to a particular user or users.

All such electronic seized evidence may be temporarily accessed for determining user attribution and to isolate it from network access or connectivity to prevent user data from being modified, deleted, or accessed.

Once such items of evidence are seized and rendered isolated, all such evidence will be searched for physical evidence such as live and deleted digital data, any hard/paper records, and any electronic records contained on such evidence

## ATTACHMENT C

### FEDERAL CITATIONS

1. 18 USC 1384, Prostitution Near Military and Naval Establishments - Within such reasonable distance of any military or naval camp, station, fort, post, yard, base, cantonment, training or mobilization place as the Secretary of the Army, the Secretary of the Navy, the Secretary of the Air Force, or any two or all of them shall determine to be needful to the efficiency, health, and welfare of the Army, the Navy, or the Air Force, and shall designate and publish in general orders or bulletins, whoever engages in prostitution or aids or abets prostitution or procures or solicits for purposes of prostitution, or keeps or sets up a house of ill fame, brothel, or bawdy house, or receives any person for purposes of lewdness, assignation, or prostitution into any vehicle, conveyance, place, structure, or building, or permits any person to remain for the purpose of lewdness, assignation, or prostitution in any vehicle, conveyance, place, structure, or building or leases or rents or contracts to lease or rent any vehicle, conveyance, place, structure or building, or part thereof, knowing or with good reason to know that it is intended to be used for any of the purposes herein prohibited shall be fined under this title or imprisoned not more than one year, or both.

2. 18 USC 287, False, Fictitious or Fraudulent Claims - Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be imprisoned not more than five years and shall be subject to a fine in the amount provided in this title.

3. 18 USC 641, Embezzlement/Misuse of Government Property - Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted.

4. 18 USC 1001, False Statements - (a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—
(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
(2) makes any materially false, fictitious, or fraudulent statement or representation; or
(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

5. 18 USC 872, Extortion of Officers or Employees of the United States - Whoever, being an officer, or employee of the United States or any department or agency thereof, or representing himself to be or assuming to act as such, under color or pretense of office or employment commits or attempts an act of extortion

6. 18 USC Sec 7 & 13 which assimilate ORC 2927.12, Ethnic intimidation - 2927.12

(A)No personshall violate section 2903.21, 2903.22, 2909.06, or 2909.07, or division (A)(3), (4),or (5) of section 2917.21 of the Revised Code byreason of the race, color, religion, or national origin of another person orgroup of persons.

ORC 2903.21, Aggravated Menacing - (A)No person shall knowingly cause another to believethat the offender will cause serious physical harm to the person or property ofthe other person, the other person's unborn, or a member of the other person'simmediate family. In addition to any other basis forthe other person's belief that the offender will cause serious physical harm tothe person or property of the other person, the other person's unborn, or amember of the other person's immediate family, the other person's belief may bebased on words or conduct of the offender that are directed at or identify acorporation, association, or other organization that employs the other personor to which the other person belongs.